**In re Neal M. JACOBS, Debtor.**

**Robert H. Holber, Trustee, Plaintiff,**

**v.**

**Neal M. Jacobs, Defendant.**

**Bankruptcy No. 01–24739ELF.
Adversary No. 02–02087ELF.**

United States Bankruptcy Court,
E.D. Pennsylvania.

Jan. 24, 2008.

See also 381 B.R. 128, 2008 WL 199892.

152

Dexter K. Case, Case, Digiamberardino & Lutz, P.C., Jennifer R. Alderfer, Wyomissing, PA, for Plaintiff.

Charles J. Phillips, Eden R. Bucher, Leisawitz Heller Abramowitch Phillips, Wyomissing, PA, John J. Miravich, Paul P. Padien, Fox Rothschild LLP, Exton, PA, for Defendant.

## MEMORANDUM OPINION

ERIC L. FRANK, Bankruptcy Judge.

### I. INTRODUCTION

In this adversary proceeding ("the § 727 AP"), Robert H. Holber, the chapter 7 trustee ("the Trustee"), invokes 11 U.S.C.

§ 727(a)(2)(A), (3) and (5)[1] and requests that the court deny the discharge of Debtor Neal M. Jacobs ("the Debtor").

Presently before me is the Trustee's Motion for Summary Judgment ("the Motion"), filed under Fed.R.Civ.P. 56(a).[2] As explained below, I conclude that the Trustee is not entitled to summary judgment on any of his claims due to the existence of genuine issues of material fact.

■ Even though I am denying the Motion, I have the authority under Rule 56(d)(1) to "determine" and enter an order "specifying" what facts are not genuinely at issue.[3] To foster efficient management of this litigation, I will exercise my authority under Rule 56(d)(1) in this proceeding.

with respect to one factual issue in connection with the Trustee's claim under § 727(a)(2)(A). Specifically, I will enter an Order determining that, with respect to his § 727(a)(2)(A) claim, the Trustee has established that the Debtor was the owner of an asset known as the Hillcrest Racquet Club ("Hillcrest") as of April 24, 2001.[4]

## II. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

■ The § 727 AP emanates from a dispute among business partners that led to extensive state litigation ("the Viener Litigation"), culminating in the entry of a state court judgment against the Debtor for approximately $1.2 million in compen-

---

1. Section 727(a) provides, in pertinent part:
 (a) The court shall grant the debtor a discharge, unless—
 . . .
 (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—
 (A) property of the debtor, within one year before the date of the filing of the petition; or
 (B) property of the estate, after the date of the filing of the petition;
 (3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;
 . . .
 (5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities. . . .

2. Fed. R. Bankr.P. 7056 makes Fed.R.Civ.P. 56 applicable in this adversary proceeding.

3. Rule 56(d) now provides in relevant part:

 (1) **Establishing Facts.** If summary judgment is not rendered on the whole action, the court should, to the extent practicable, determine what material facts are not genuinely at issue. The court should so determine by examining the pleadings and evidence before it and by interrogating the attorneys. It should then issue an order specifying what facts—including items of damages or other relief—are not genuinely at issue. The facts so specified must be treated as established in the action.
 The text quoted above is the current version of the rule, as amended effective December 1, 2007. The language of Rule 56 was amended "as part of the general restyling of the Civil Rules to make them more easily understood and to make style and terminology consistent throughout the rules." See Advisory Committee Note, 2007 Amendment to Fed.R.Civ.P. 56. If the changes in Rule 56 had been substantive, I would have had to determine which version of the rule should be applied to a motion pending on the effective date of the change. Because the amendment was intended to be stylistic only, it is unnecessary to do so and, in this Memorandum Opinion, I will refer the new version of rule.

4. Issues remaining under § 727(a)(2)(A) include whether the Debtor concealed his ownership of Hillcrest, with the requisite intent, within the time frame required by the Code for denial of his discharge.

satory damages and $1 million in punitive damages. The facts and procedural history of the Viener Litigation are rather elaborate. The details are available to the interested reader in several opinions that the state trial court ("the Trial Court")[5] and the Pennsylvania Superior Court have issued.[6] Therefore, I will not further encumber the record with a full recitation, but will limit myself to the brief summary needed to understand the issues the Motion raises.

## A. Factual Background

Over twenty years ago, the Debtor, along with two other business associates, George Viener ("Viener") and Norman Rush ("Rush"), formed a textile manufacturing company called "NGN"—NGN standing for Neal, George and Norman.[7] Viener, Rush and the Debtor were officers and employees of NGN. At all relevant times, Viener, Rush and the Debtor each owned one-third (1/3) of NGN's outstanding stock.

Also involved in the factual matrix of this proceeding are three other entities.

First is Reading Garment Company ("RGC"). Viener, Rush, the Debtor and a fourth individual, Allen Friedman ("Friedman"), each owned one-quarter (1/4) of

RGS's outstanding stock. RGC also was in the textile manufacturing industry and operated in harmony with NGN.[8]

Second is NV Sportwear, Inc. ("NV Sportswear"), one of NGN's largest subcontractors. The majority shareholder of NV Sportswear is an individual named Kim Van Vu ("Ms. Van Vu").

Third is a company called "Kimmex." Like NGN and RGC, Kimmex was in the textile manufacturing business.[9]

In 1994, Viener expressed concerns about NGN's management and operation.[10] Soon thereafter, the Debtor and Rush voted to remove Viener as president of NGN and demoted him to vice-president, although his salary remained the same. Michael A. Joffred ("Joffred") replaced Viener as NGN's president. In January 1995, the Debtor and Rush advised Viener by letter that NGN's Board of Directors had terminated Viener's employment. Viener remained on NGN's Board of Directors after being fired. Ultimately, neither NGN nor RGC survived as profitable entities. NGN and RGC ceased business operations in August 1997.

## B. The Initial State Court Proceedings

In February 1995, Viener initiated the Viener Litigation against the Debtor,

---

5. The case was tried in the Court of Common Pleas, Berks County.

6. *See Viener v. Jacobs,* 51 Pa. D. & C.4th 260 (C.P. Berks 2000) (*"Jacobs I"*), *affd,* 834 A.2d 546 (Pa.Super.2003) (*"Jacobs III"*); *Viener v. Jacobs,* 52 Pa. D. & C.4th 353 (C.P. Berks April 24, 2001) (*"Jacobs II"*), *aff'd in part and rev'd in part,* 834 A.2d 546 (Pa.Super.2003); *Viener v. Jacobs,* 931 A.2d 61 (Pa.Super.2007) (not precedential) (*"Jacobs IV"*).

 A bankruptcy court may take judicial notice of the matters of record in the state courts within its jurisdiction. *E.g., In re Soto,* 221 B.R. 343, 347 (Bankr.E.D.Pa.1998).

7. The information set forth in Part II.A. are facts that are undisputed by the parties.

8. The Trial Court stated, "NGN purchased fabric and marketed the men's apparel line and RGC marketed the ladies' apparel line." *Jacobs I,* 51 D & C.4th at 288.

9. In *Jacobs II,* the state trial court found that Ms. Van Vu and the Debtor were "partners" in Kimmex. *See Jacobs II,* 52 Pa. D. & C.4th at 360 (Findings of Fact Nos. 36–38).

10. Viener's concerns centered on: (1) cash payments the Debtor authorized to NV Sportswear and to NV Sportswear's majority shareholder, Ms. Van Vu, and (2) the acquisition and location of certain machinery and equipment.

Rush, Joffred, Allen Friedman and several business entities by filing a complaint in the Trial Court.[11] The complaint alleged, *inter alia:* that Viener's former business partners conspired to discharge him wrongfully from his position as President of NGN and from his employment with RGC; that the Debtor, Rush and Friedman breached their fiduciary duty to Viener as a minority shareholder; and that the Debtor, Rush and Friedman engaged in a civil conspiracy to deprive Viener's rights as a minority shareholder. In May 1995, Viener filed a Second Amended Complaint that alleged that the Debtor usurped and appropriated a corporate opportunity of NGN by purchasing a sewing facility in Mexico with Ms. Van Vu to produce garments for NGN that would be accounted separately from other NGN sales. *Jacobs III*, 834 A.2d at 551. For various reasons, not material to the Motion, by the time the Viener Litigation was ready for trial, Viener's only remaining claims were those alleged against the Debtor.

The parties agreed to a bifurcated non-jury trial in the Viener Litigation. After the trial on liability, the Trial Court entered a Decree *Nisi* in Viener's favor on June 30, 2000 and determined that the Debtor was liable for both compensatory and punitive damages. The Trial Court made detailed Findings of Fact and Conclusions of Law. The court found that the Debtor: (1) in concert with other shareholders acted as a majority shareholder in NGN and RGC, (2) owed a fiduciary duty to Viener, the minority shareholder and (3) breached that fiduciary duty. *Jacobs I*, at

281–296.[12] In short, the court found that the Debtor "squeezed Viener out of NGN and RGC" and "left him with an interest in a corporate shell." *Jacobs I*, 51 D. & C.4th at 295. The court found that this was accomplished by "fraud, self-dealing, self-interest and misconduct by [the Debtor]." *Id.* at 282.

The damage phase of the trial was held on September 7, 8, 12, 20 and 28, 2000 and the court reopened the record for rebuttal in April 2001. On April 24, 2001, the Trial Court entered an award in favor of Viener in the amount of $1.2 million dollars in compensatory damages and $1 million dollars in punitive damages. Among other things, and particularly relevant for purposes of this § 727 AP, following the hearing on damages, the Trial Court concluded that the Debtor intentionally concealed assets and misrepresented his net worth to the court. *See Jacobs II.*

The Debtor filed Post–Trial Motions, which were denied by the Trial Court. On July 12, 2001, the judgment was entered. The Debtor appealed the judgment to the Pennsylvania Superior Court.

**C. The Bankruptcy Proceedings and the Later State Court Proceedings**

On October 11, 2001, after the Debtor filed his notice of appeal in the Viener Litigation but before the Trial Court filed its Pa.R.A.P. 1925(a) Opinion in the Viener Litigation, the Debtor filed his chapter 7 bankruptcy petition. The commencement of the bankruptcy case stayed the state

---

**11.** The Complaint also named as defendants NGN and its following affiliates: RGC, Ellmar Manufacturing Inc., Nagan Leasing Inc., Energy Knits, Inc., Reading Dyeing and Finishing Inc., Little Creek Mills Inc., LCMA Inc., Amity Finishing Inc. and G.N.K. Partnership.

**12.** In its opinion affirming the Trial Court decision on liability, the Pennsylvania Superior Court described the finding as follows: "the trial court concluded that Jacobs, as majority shareholder, owed a fiduciary duty to Viener, as minority shareholder, and that Jacobs' conduct in 'freezing out' Viener was outrageous and oppressive." *Jacobs III*, 834 A.2d at 553.

court appeal. The Trial Court, nevertheless, filed a Pa.R.A.P. 1925(a) Opinion on October 25, 2001, addressing the Debtor's appellate issues. Thereafter, the automatic stay was lifted, and the appeal was reinstated.

On March 26, 2002, the Trustee filed an adversary complaint objecting to the Debtor's discharge, thereby commencing the § 727 AP. The Complaint alleges that the Debtor should be denied a discharge under 11 U.S.C. §§ 727(a)(2)(A), (a)(3) and (5).

Shortly before the commencement of the § 727 AP, Viener filed a separate adversary proceeding against the Debtor, docketed as Adv. No. 02–2023, by filing a complaint requesting a determination that his claim against the Debtor was nondischargeable pursuant to 11 U.S.C. § 523 ("the § 523 AP").

In the § 727 AP, the Debtor filed an Answer to the Complaint on September 11, 2002. *See* Adv. No. 02–2087 (Docket Entry No. 4). On October 28, 2002, the court entered an order approving a stipulation staying all further proceedings in the § 727 AP pending the entry of a final, non-appealable order in the state court proceedings. *See id.* (Docket Entry No. 8).[13]

On September 3, 2003, the Superior Court affirmed in part and reversed in part the orders of the Trial Court in *Jacobs II*, and remanded the matter. *See Jacobs III*. The Debtor sought further review by the Pennsylvania Supreme Court, which was denied on August 16, 2004. *See Viener v. Jacobs*, 579 Pa. 704, 857 A.2d 680

(2004). The U.S. Supreme Court denied certiorari on February 22, 2005. *See Jacobs v. Viener*, 543 U.S. 1146, 125 S.Ct. 1300, 161 L.Ed.2d 107 (2005).

On March 22, 2006, the Debtor's counsel filed a status letter with this court stating that, on October 12, 2005, following the Superior Court remand in the Viener Litigation, the Trial Court had carried out its mandate and recalculated the damages awarded Viener.[14] *See* Docket Entry No. 28. The March 22, 2006 letter also advised the court that the Debtor's post-trial motions objecting to the damages recalculation were denied on February 10, 2006. *Id.* However, the Debtor's counsel indicated that she and the Trustee's counsel believed that the adversary proceedings should remain stayed because, on March 7, 2006, the Debtor had filed a timely appeal from the Trial Court's February 10, 2006 Order denying the Debtor's post-trial motions from that Order on March 7, 2006. *Id.*

I held a status hearing on November 11, 2006 in both the § 523 and § 727 adversary proceedings.[15] At that time, the parties agreed that it was no longer advisable to stay the adversary proceedings while awaiting the outcome of the Viener Litigation. Rather, the parties requested the opportunity to determine whether the two (2) adversary proceedings were most appropriately resolved by way of summary judgment. Consequently, I entered a Pre–Trial Order on November 8, 2006 establishing deadlines for summary judgment motions and responses thereto. *See*

---

13. A similar order was entered in the § 523 AP on April 18, 2002. *See* Adv. No. 02–2023 (Docket Entry No. 7).

14. For present purposes, the amount of the modification was modest and immaterial.

15. Prior to his retirement on February 14, 2006, the Hon. Thomas M. Twardowski presided over the Debtor's main bankruptcy case,

the § 727 AP and the § 523 AP. Upon Judge Twardowski's retirement, the bankruptcy case and the adversary proceedings were assigned to his successor, the Hon. Richard E. Fehling. On July 12, 2006, Judge Fehling entered an order recusing himself and all of the bankruptcy matters were reassigned to me. *See See* Adv. No. 02–2023 (Docket Entry No. 30).

Adv. No. 02–2087, Docket Entry No. 36; Adv. No. 02–2023, Docket Entry No. 7.

In the § 727 AP, the Trustee filed the Motion on December 22, 2006.[16] After all of the written submissions were filed, I held argument on the Motion (along with the corresponding summary judgment motion filed in the § 523 AP) on June 13, 2007 and took the matter under advisement.[17]

## III. THE LEGAL STANDARD FOR SUMMARY JUDGMENT

Pursuant to Rule 56(c), summary judgment should be granted when the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). The standard for evaluating a motion for summary judgment under Fed.R.Civ.P. 56 is well established and has been stated in numerous written opinions in this district. E.g., In re Klayman, 333 B.R. 695 (Bankr.E.D.Pa.2005); In re Laceen, 2005 WL 1155257 (Bankr.E.D.Pa. Apr. 28, 2005) (per Sigmund, Ch. J.); In re Lewis, 290 B.R. 541 (Bankr.E.D.Pa.2003) (per Carey, J.); In re Newman, 304 B.R. 188 (Bankr.E.D.Pa.2002) (per Fox, Ch. J.).

Before a motion for summary judgment may be granted, the court must find that the motion alleges facts which, if proven at trial, would require a directed verdict in favor of the movant. See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir.1993). If the movant meets this initial burden, the responding party may not rest on his or her pleadings, but must designate specific factual averments through the use of affidavits or other permissible evidentiary material that demonstrate a triable factual dispute.[18] Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). Such evidence must be sufficient to support a jury's factual determination in favor of the nonmoving party. Id. Evidence that merely raises some metaphysical doubt regarding the validity of a material facts is insufficient. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). If the party opposing the motion believes that summary judgment is premature, Rule 56(f) requires the party to present by affidavit the reasons why the party is presently unable to submit evi-

---

**16.** In the § 523 AP, Viener filed a motion for summary judgment. By separate Memorandum Opinion and Order entered on this date, I have granted Viener's motion and determined that the debt arising from the state court judgment that Viener holds against the Debtor is nondischargeable under 11 U.S.C. § 523(a)(6).

**17.** Coincidentally, the Superior Court rendered a decision affirming the Trial Court's order recalculating damages after the initial remand on June 12, 2007, the day before argument on the Motion.

**18.** The parties' respective burdens of proof also play a role in determining the merits of a summary judgment motion:

[W]here the movant is the defendant, or the party without the burden of proof on the underlying claim, the movant still has the initial burden of showing the court the absence of a genuine issue of material fact, but ... this does not require the movant to support the motion with affidavits or other materials that negated the opponent's claim. In contrast, where ... "the party moving for summary judgment is the plaintiff, or the party who bears the burden of proof at trial, the standard is more stringent." National State Bank v. Federal Reserve Bank, 979 F.2d 1579, 1582 (3d Cir. 1992).

In re Newman, 304 B.R. at 193 (quoting Adams v. Consolidated Rail Corp., 1994 WL 383633, *1–*2 (E.D.Pa. July 22, 1994)).

dence in opposition to the motion. *Celotex,* 477 U.S. at 326, 106 S.Ct. at 2554, 106 S.Ct. 2548.

In considering the evidentiary matter submitted in support and in opposition to a summary judgment motion, the court's role is not to weigh the evidence, but only to determine whether there is a disputed, material fact for determination at trial. *Anderson,* 477 U.S. at 247–50, 106 S.Ct. at 2510–11. A dispute about a "material" fact is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.* at 248, 106 S.Ct. at 2510. All reasonable inferences must be drawn in favor of the nonmoving party and against the movant. *United States v. 717 South Woodward Street,* 2 F.3d 529, 533 (3d Cir.1993).

A court is not foreclosed from narrowing the issues to simplify the trial simply because certain material facts remain in dispute, thereby rendering summary judgment inappropriate. For those cases that cannot be fully adjudicated on a summary judgment motion, Fed.R.Civ.P. 56(d) permits a court to make an interlocutory summary adjudication, sometimes referred to as "partial summary judgment",[19] on fewer than all the issues. *See In re Summit Airlines, Inc.,* 160 B.R. 911, 916 (Bankr. E.D.Pa.1993). In rendering a partial summary judgment, a court "may dispose of only a single issue relevant to a claim." Jeffery W. Stempel, 11 *Moore's Federal Practice* ¶ 56.40[2] (2007). An order entered pursuant to Rule 56(d) is not a final order for appellate purposes, however. *Selkridge v. United of Omaha Life Ins. Co.,* 360 F.3d 155, 161 (3d Cir.2004). Such decisions are interlocutory because they are entered prior to the final disposition of a case and do not result in an appealable judgment. See 11 Moore's Federal Practice ¶ 56.40[2], [3]. Therefore, a court may revise the order later in the litigation if circumstances warrant. *Id.*

## IV. SUMMARY JUDGMENT WILL BE DENIED ON THE § 727(a)(2)(A) CLAIM

### A. Legal Standard for Denial of Discharge under § 727(a)(2)(a)

■■■ A party seeking to bar a debtor's discharge pursuant to § 727(a)(2)(A) must show:

**19.** Reference to this type of disposition under Rule 56(d)(1) as "partial summary judgment" has been criticized:

> Because Rule 56(d) is part of the rule entitled "Summary Judgment," the order prescribed by the rule has been referred to as a "partial summary judgment." This characterization has been the source of considerable confusion about the nature of the order issued under Rule 56(d), particularly with regard to its binding effect and appealability. Rule 54(a) defines a "judgment," for purposes of the federal rules, to include a decree and any order from which an appeal lies. Absent a specific statutory exception, an order must be final to be appealable. By its terms, Rule 56(d) involves an adjudication of less than the entire action, and consequently does not purport to authorize a final and appealable judgment. As was pointed out in the 1948 Advisory Committee Note to Rule 56, a subdivision (d) order is not a judgment at all but "merely a pretrial adjudication that certain issues shall be deemed established for the trial of the case." It also follows that an order issued pursuant to Rule 56(d) has no preclusive impact, since the trial court retains jurisdiction to modify the order at any time prior to the entry of a final judgment. Thus, as asserted in one early Second Circuit opinion on the question, courts should take care to make it clear that the order simply delimits the issues and is not a judgment so that "the parties will then more fully recognize their rights and the court will have retained full power, as it should, to make one complete adjudication on all aspects of the case when the proper time arrives." 10B C. Wright & A. Miller, *Federal Practice and Procedure 3d* § 2737 (West 2007).

1. an act, such as a transfer or concealment of property in which the debtor has a direct proprietary interest;

2. the debtor's subjective intent to hinder, delay, or defraud a creditor or the bankruptcy trustee through such act, and

3. that such act and the debtor's subjective intent occurred within the one year period preceding the filing of the bankruptcy petition.

*See Rosen v. Bezner,* 996 F.2d 1527, 1531 (3d Cir.1993); *In re Spitko,* 357 B.R. 272, 299 (Bankr.E.D.Pa.2006) (citations omitted). The plaintiff bears the burden of proving these three requirements by a preponderance of the evidence. *Spitko,* 357 B.R. at 298; *In re Kisberg,* 150 B.R. 354, 357 (Bankr.M.D.Pa.1992).

## B. The *Jacobs II* Decision

Because it is pivotal to the discussion that follows, I pause to describe the findings of the Trial Court in *Jacobs II* and the context in which those findings were made.

On June 30, 2000, the liability phase of the state court trial resulted in the Trial Court finding the Debtor liable to Viener for compensatory damages for breach of fiduciary duty and for punitive damages due to "outrageous conduct." *See Jacobs I,* 51 Pa. D. & C.4th at 298. Then, the Trial Court proceeded with the damages phase of the trial in September 2000. At that time, the following issues were before the Trial Court:

1. the date as to when the damages should be fixed;

2. the proper value of Viener's shares in NGN and RGC and any related damages; and

3. the appropriate amount of punitive damages that would punish [the Debtor] for his outrageous conduct.

*Jacobs II,* 52 D. & C.4th at 355.

Most relevant for purposes of the Motion in this court is the Trial Court's determination with respect to the third issue, punitive damages. After concluding the damages phase, the Trial Court issued an opinion explaining the basis for its decision to hold the Debtor liable for, *inter alia,* $1 million in punitive damages. *See Jacobs II.*

The Trial Court explained that, in assessing punitive damages, it was entitled to consider the character of the Debtor's act,[20] the nature and extent of Viener's harm *and the Debtor's wealth. Id.* at 383 (emphasis added) (citing *Kirkbride v. Lisbon Contractors Inc.,* 521 Pa. 97, 555 A.2d 800, 802 (1989)). With those factors at issue, it is not surprising that the evidence the Trial Court received in the damages phase included a personal financial statement submitted by the Debtor. That statement purported to show the Debtor had negligible assets and nearly $2.3 million dollars of debt. *Jacobs II,* 52 D. & C.4th at 368. The Debtor claimed that the only assets he held individually were worth $500 and that he had no income. *Id.*

In rejecting the financial self-portrait the Debtor presented, the Trial Court found that the Debtor's financial statement was "false in many respects, and, when taken as a whole, materially misleading" because "it omitted critical information regarding his ownership interests in bank accounts and investment accounts and greatly exaggerated his obligations." *Id.*

---

20. When describing the Debtor's conduct in breaching his fiduciary duty of loyalty and fairness to Viener, the court said that the Debtor's conduct was "wantonly tortious."

*Id.* at 383. Punitive damages were imposed to punish the Debtor "for his self-dealing and outrageous conduct." *Id.*

The Trial Court concluded that the Debtor proffered the financial statement "to convey the impression that he is penniless and deeply in debt," *id.*, and expressed its outrage at what it considered to be the Debtor's misrepresentations to the court:

> [The Debtor] has deliberately misrepresented his net worth to this court. In fact, [the Debtor] thumbed his nose at the court with his testimony. He testified that he had an old automobile worth $500 and nothing more. He testified that his daily living expenses were paid by his associate, Ms. Van Vu, that she gave him his lunch money, and that she provided him with a place to stay, her house in California, for nothing, apparently out of the goodness of her heart. [The Debtor] testified that he owned nothing but the car, that his 49 percent interest in Kimmex was valueless. He asserted his interests in the tennis club, the Greshville Inn and The Mad Hatter were valueless. He skipped completely over his IRA account and its value and his other investments. He was, according to him, all but destitute and penniless.

*Jacobs II*, 52 D. & C.4th at 384.

Based on the findings of the Trial Court, the Trustee urges this court to apply collateral estoppel to grant summary judgment on his § 727(a)(2)(A) claim.

## C. Application of Collateral Estoppel to the § 727(a)(2)(A) Claim

### 1. summary of the Trustee's theory of the case

The Trustee asserts that, by virtue of the doctrine of collateral estoppel, the Debtor is precluded from contesting the Trial Court's findings in the Viener Litigation. The consequence, the Trustee contends, is that there are no disputed issues of fact and that he is entitled to judgment as a matter of law under § 727(a)(2)(A). Specifically, the Trustee argues that the Debtor's discharge should be denied based on his concealment of his ownership of Hillcrest. *See* Trustee's Brief in Support of Summary Judgment ("Trustee's Brief") at 5.[21]

The Trustee's theory of summary judgment requires that I find that: (1) the Debtor owned Hillcrest at the time he made his disclosure to the Trial Court in the damages phase of the Viener Litigation; (2) he concealed that ownership; (3) with intent to hinder, delay or defraud a creditor; (4) within one year of the commencement of the bankruptcy case. The Debtor vigorously contests every step in this theory.

As detailed below, the doctrine of collateral estoppel allows the Trustee to satisfy the first step in the argument. However, that is the extent of the benefit the Trustee can obtain from the doctrine. There-

---

21. The Trustee does not explain why, in light of the broad scope of the Trial Court's findings in *Jacobs II*, see Part IV.B., *supra*, he bases his right to summary judgment under § 727(a)(2)(A) solely on the Debtor's alleged concealment of a single asset, *i.e.*, Hillcrest. Whatever his reasons may be, I will hold him to the argument as articulated. It is not the court's role on summary judgment to rummage through the record and fashion additional arguments to support or negate a party's entitlement to relief. As the court stated in *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir.1994) (citations omitted) (emphasis added):

> [B]ecause summary judgment is not a paper trial, the district court's role in deciding the motion is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide based on evidence of record, whether there is any material dispute of fact that requires a trial. *The parties, in turn, bear a concomitant burden to identify the evidence that will facilitate this assessment.*

fore, the Motion falls short under § 727(a)(2)(A).

## 2. general principles governing the doctrine of collateral estoppel

■ The doctrine of collateral estoppel is applicable in bankruptcy proceedings involving the denial of a discharge under § 727.[22] The use of a prior state court decision to preclude the relitigation of issues in a subsequent federal proceeding is grounded in 28 U.S.C. § 1738, which provides:

> ... Acts, records and judicial proceedings [of any court of a State, Territory, or Possession of the United States] shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken.

■ Under § 1738, I look to Pennsylvania law to determine the preclusive effect, if any, of the findings in the Viener Litigation.[23] Under Pennsylvania law, collateral estoppel applies when:

(1) an issue is identical to one that was presented in a prior case;

(2) there has been a final judgment on the merits of the issue in the prior case;

(3) the party against whom the doctrine is asserted was a party in, or in privity with a party in, the prior action;

(4) the party against whom the doctrine is asserted, or one in privity with the party, had a full and fair opportunity to litigate the issue in the prior proceeding; and

(5) the determination in the prior proceeding was essential to the judgment.

*E.g., Cohen v. Worker' Comp. Appeal Bd. (City of Philadelphia)*, 589 Pa. 498, 909 A.2d 1261, 1264 (2006); *Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*, 458 F.3d 244, 245–246 (3d Cir.2006); *In re Randall*, 358 B.R. 145, 164 (Bankr.E.D.Pa. 2006).[24]

---

**22.** *See In re Petersen*, 315 B.R. 728, 734 (Bankr.C.D.Ill.2004); *In re Monus*, 294 B.R. 707, 713 (Bankr.N.D.Ohio 2003), *aff'd*, 167 Fed.Appx. 494 (6th Cir.2006) (unpublished); *accord Grogan v. Garner*, 498 U.S. 279, 285, 111 S.Ct. 654, 112 L.Ed.2d 755(1991) (collateral estoppel principles apply in dischargeability actions); *see also In re Schumann*, 2005 WL 3465624 (Bankr.W.D.Tex. Jan. 3, 2005) (collateral estoppel applied in proceeding under § 727(a)(2) based on findings made in proceeding under 11 U.S.C. § 548).

**23.** *See, e.g., National R.R. Passenger Corp. v. Pennsylvania Public Util. Comm'n*, 342 F.3d 242, 254 (3d Cir.2003) ("a federal court generally must give deference to a state court judgment, granting the same preclusive effect to a state-court judgment as another court of that State would give"); *Walzer v. Muriel, Siebert & Co., Inc.*, 221 Fed.Appx. 153, 155 (3d Cir.2007) (non-precedential); *In re Titus & McConomy, LLP*, 375 B.R. 165, 172–173 (Bankr.W.D.Pa.2007); *In re Dawley*, 312 B.R. 765, 775 (Bankr.E.D.Pa.2004).

**24.** I am aware of the Pennsylvania and federal decisions applying Pennsylvania law that have employed only a four-part test in applying collateral estoppel rather than the five-part test set forth above in the text. The difference between the two tests is that the "four-part test" does not include the "fifth element" (*i.e.*, that the prior determination was "essential to the judgment"). *Compare Greenway Ctr. v. Essex Ins. Co.*, 475 F.3d 139, 147 (3d Cir.2007); *Greenleaf v. Garlock*, 174 F.3d 352, 357–58 (3d Cir.1999); *Tucker v. Philadelphia Daily News*, 577 Pa. 598, 848 A.2d 113, 119 n. 11 (2004) *with Graham v. City of Philadelphia*, 402 F.3d 139, 144 n. 5 (3d Cir.2005); *National R.R. Passenger Corp. v. Pa. Public Utility Comm'n*, 342 F.3d at 252; *Office of Disciplinary Counsel v. Kiesewetter*, 585 Pa. 477, 889 A.2d 47, 50–51 (2005).

In this case, I will assume *arguendo* that the "fifth element" is essential to the application of collateral estoppel in Pennsylvania. Since, as explained below, I find that the "fifth element" is satisfied here with respect to the facts necessary to the facts found by the Trial Court on the issue of concealment of property

### 3. the Debtor was the owner of Hillcrest at the time of the damages phase of the Viener Litigation

With no difficulty, I conclude that all of the elements for the application of collateral estoppel are satisfied and that the Trustee has established that the Debtor was the owner of Hillcrest at the time of the damages phase of the Viener Litigation.

The Trial Court's finding regarding the ownership of Hillcrest is identical to the issue that must be determined in a proceeding under 11 U.S.C. § 727(a)(2)(A).[25] There has been a final judgment on the merits.[26] The Debtor, the party against whom the doctrine is being asserted, was a party in the Viener Litigation. And, the Debtor had a full and fair opportunity to litigate the issue in the prior proceeding.[27]

It is a somewhat closer question whether the finding of the Trial Court relating to the Debtor's ownership of Hillcrest was essential to the judgment (assuming *arguendo* that the Trustee must prove that point, see n. 24, *supra*). However, as explained below I resolve that issue in favor of the Trustee.

"A determination is essential to a judgment when the issue is actually recognized by the parties as important and by the trier of fact as necessary to the first judgment...." J. Dvorske, 10 Standard Pennsylvania Practice 2d § 65:100 (2007). Determinations are not "essential to the judgment" if they "have the characteristics of dicta, and may not ordinarily be the subject of an appeal by the party against whom they were made." *Restatement (Second) of Judgments* § 27, cmt. h (2007).

Based on my review of the Trial Court's opinion, I conclude that its findings regarding the Debtor's assets (including Hillcrest, in particular) were woven into the fabric of the court's analysis and did not have the characteristics of dicta.

Though evidence of personal wealth is not mandatory in the determination of punitive damages under Pennsylvania law, *see Jacobs III*, 834 A.2d at 561 (citing *Shiner v. Moriarty*, 706 A.2d 1228, 1242 (Pa.Super.1998)), the Trial Court expressly acknowledged that, in rendering a punitive award, it considered the Debtor's net worth. *Jacobs II*, 52 D. & C.4th at 387 ("we find that the evidence presented on Jacobs' net worth provides us with a sufficient basis to determine the amount of punitive damages appropriate to Jacobs' means"). In so doing, the court made several findings regarding the financial picture the Debtor presented to the court, including the following relating to Hillcrest:

> (128) Jacobs also claims to have transferred his one half ownership in Hillcrest Racquet Club to his son, Matt, in

---

within the meaning of 11 U.S.C. § 727(a)(2)(A), it is not necessary to determine whether the "fifth element" is required.

**25.** The Trial Court found that the Debtor was, in fact, the owner of Hillcrest despite his steadfast denial of ownership. *See Jacobs II*, 52 D. & C.4th at 371 (Finding of Fact Nos. 128–30).

**26.** The fact that the Debtor appealed the Trial Court's order awarding punitive damages and then appealed it again after it was entered again after remand does not impair the order's finality for purposes of collateral estoppel. *See, e.g., Shaffer v. Smith*, 543 Pa. 526, 673 A.2d 872 (1996); *Philadelphia Fraternal Order of Correctional Officers v. Rendell*, 701 A.2d 600 (Pa.Cmwlth.1997); *In re McGinley*, 2002 WL 1205033, at *5 & n. 7 (Bankr. E.D.Pa. May 14, 2002).

**27.** The damages phase of the trial included five (5) trial dates in September 2000 and the record was reopened in April 2001 before the court issued its decision.

August 1995, for no consideration; he never told his accountant that he had made this gift or reported it to the IRS. (129) Jacobs tax returns after 1995 impute Hillcrest earnings and loss to Jacobs and his wife.

(130) Jacobs did not in fact transfer his interest in Hillcrest Racquet Club to his son or anyone else in 1995 or at any other time.

*Jacobs II,* 52 D. & C.4th at 371. These sort of discrepancies made it impossible for the Trial Court to get a precise financial picture of the Debtor. However, such precision was unnecessary to render the punitive award because the court uncovered nineteen (19) various accounts and investments from which the Debtor could draw. This enabled the court to come to make a sufficient assessment of the Debt-

or's level of wealth to render a punitive award. *Jacobs II,* 52 D. & C.4th at 386.

 The Trial Court's finding that the Debtor retained an interest in Hillcrest, a valuable asset, was an integral part of its analysis, not a gratuitous observation.[28] Based on the role this finding played in the Trial Court's decision fixing the amount of punitive damages awarded, I must give it preclusive effect, despite the Debtor's continued representation that he transferred his interest to his son in 1995.[29] Of course, this conclusion, by itself, does not mandate denial of the Debtor's discharge as requested by the Trustee. I turn now to the question whether the Trustee has proven that the Debtor acted with "intent to hinder, delay or defraud" as required under § 727(a)(2)(A).[30]

---

28. The court reasoned:

> We turn our attention to the above assets, not because they are subject to, or immune from, Jacobs' creditors, and not because they are owned solely by him, or by him and others, but because they show the monies that he uses and has access to, and, therefore, such assets are a part of the assets which this court can, and will, consider in fixing an appropriate sum for punitive damages.
>
> This court will not permit Jacobs' mendacity, his outright lies, his refusal to honor this court's subpoenas, to now be turned to his benefit, and while we cannot ascertain his precise net worth, we are satisfied that his various business interests, including his arrangements with Ms. Van Vu, give him access to substantial assets.

*Jacobs II,* 52 D. & C.4th at 387.

29. I note briefly that one of the exhibits the Debtor attached to his response was a Declaration from John Miravich, Esquire. Mr. Miravich represented the Debtor for six years in the state court litigation. In his Declaration, Mr. Miravich summarized areas of testimony given in the state court proceedings. As to Hillcrest, he asserted that the "trial court erroneously found that Jacobs owned Hillcrest" and attached an exhibit that he

represented supported that conclusion. Mr. Miravich's statement reveals only that he and the Debtor believe that the Trial Court erred. That is a legally insufficient basis for relitigation of an issue in this court when the doctrine of collateral estoppel is applicable. Further, more generally, it is not the role of a federal trial court to sit in judgment of the accuracy of the factfinding done by a state court. *See In re Knapper,* 407 F.3d 573, 580 (3d Cir.2005) (in connection with the *Rooker–Feldman* doctrine, stating the principle that lower federal courts do not function as state appellate courts).

30. There may be an overlap between the concepts of "concealment" and an "intent to hinder, delay or defraud." The term concealment connotes that the actor is purposely hiding something for some improper purpose. *See* Black's Law Dictionary 360 (rev. 4th ed.1968) (defining term as a withholding of something that "one *knows* and which one, in duty is bound to reveal") (emphasis added). For purposes of resolving the motion for summary judgment, I need not explore this question further. As explained below, the Trustee has not proven that the Debtor had the requisite intent under § 727(a)(2). Similarly, whether the Debtor's conduct in Viener Litigation amounted to a "concealment" also can be decided at trial.

**4. the Trustee has not established, through collateral estoppel, the Debtor's intent to hinder, delay or defraud under § 727(a)(2)(A)**

 To satisfy the "intent" requirement of 11 U.S.C. § 727(a)(2)(A), the Trustee must prove that the Debtor had an actual intent to defraud. *E.g., Spitko,* 357 B.R. at 301. Fraudulent intent may be inferred from circumstantial evidence of a course of conduct, however, because courts recognize that it is unlikely that a debtor will unlikely admit to being motived by fraud. *Id.* As explained by my colleague Judge Fox in *Spitko,* there are certain types of circumstantial evidence, also known as "badges of fraud" that courts generally look to when inferring fraudulent intent:

> Courts have articulated some generalities concerning the circumstantial evidence from which fraud may be inferred. For example, fraudulent intent may be found where a transfer is gratuitous or made to the debtor's relative. *See Matter of Chastant,* 873 F.2d 89, 91 (5th Cir.1989); *In re Lang,* 246 B.R. 463, 470 (Bankr.D.Mass.2000); *In re Kablaoui,* 196 B.R. 705, 710 (Bankr.S.D.N.Y.1996). In addition, courts have established "badges of fraud" that "strongly suggest

that a transaction's purpose is to defraud creditors unless some other convincing explanation appears." *In re Woodfield,* 978 F.2d 516, 518 (9th Cir. 1992). These badges include:

> (1) a close relationship between the transferor and the transferee; (2) that the transfer was in anticipation of a pending suit; (3) that the transferor Debtor was insolvent or in poor financial condition at the time; (4) that all or substantially all of the Debtor's property was transferred; (5) that the transfer so completely depleted the Debtor's assets that the creditor has been hindered or delayed in recovering any part of the judgment; and (6) that the Debtor received inadequate consideration for the transfer.

*Id.* (citations omitted); *see generally In re Crater,* 286 B.R. 756 (Bankr.D.Ariz.2002) (thoughtful discussion of the use of "badges of fraud" in a § 727 proceeding).

 For several reasons, the Trustee has not proven, through the doctrine of collateral estoppel, that the Debtor had the requisite intent under § 727(a)(2)(A).

First, although the Trial Court found that the Debtor misrepresented the status of various other assets,[31] the Trial Court

---

**31.** The Trial Court found, inter alia:

1. The Debtor had access to and could draw upon various bank accounts titled in his name and the names of his various businesses.
 . . .
2. The Debtor was entitled to receive $225,000 in tax refunds on account of the failure of NGN, but he failed to disclose that entitlement on the financial statement he submitted to the court.
3. The Debtor earned substantial income following the collapse of NGN that he did not voluntarily disclose.
4. Although the Debtor's financial statement showed Kimmex to be worthless, the Debtor claimed to have supplied over $200,000

worth of personally owned equipment to Kimmex.
5. The Debtor failed to disclose his ownership in several significant brokerage accounts.
6. The Debtor failed to disclose that he held a mortgage on a property owned by Greshville Realty in the amount of $135,000, which generated $2,000 per month.
7. Although the Debtor claimed to have assigned all of his interests in the Greshville Inn to his wife as security for repayment of the purchase of the Inn, the court found that no assignment was made to the Debtor's wife or anyone else.
8. Although the Debtor claimed to have gifted a restaurant called "The Mad Hatter" to

did not make a specific finding as to the Debtor's intent to conceal Hillcrest. The Trial Court expressly found only that the transfer did not occur and that the Debtor retained his one-half interest.

Second, notwithstanding the numerous findings that the Debtor concealed certain assets in the course of a state court proceeding whose purpose was to liquidate the Debtor's punitive damages liability and the Trial Court's expression of its strong feelings regarding the Debtor's lack of candor,[32] the issue of the Debtor's intent to conceal his interest in Hillcrest was not "actually litigated" at the damages hearing in the Viener Litigation.

Under Pennsylvania law, for an issue to be "actually litigated" it must be "properly raised, submitted for determination, and then actually determined." John J. Dvorske, 10 Standard Pennsylvania Practice 2d § 65:98 (citing *Com. v. Holder*, 569 Pa. 474, 805 A.2d 499 (2002)). There is nothing in the *Jacobs II* opinion that demonstrates that the issue of the Debtor's intent regarding the concealment of an interest in Hillcrest was raised and submitted to the Trial Court for purposes of rendering the punitive award.[33] Rather, it appears to be an issue that the Trial Court identified only after the parties completed their evidentiary submissions.[34]

his son, Matt, in 1997, the court found that the no such gift was made. *Jacobs II*, 52 D. & C.4th at 368–375.

32. In addition to saying that the Debtor "deliberately misrepresented his net worth to the court," made a "fraudulent conveyance" to Ms. Van Vu and "willfully concealed" his interest in Kimmex and NV Sportswear, the Trial Court further expressed its disapproval of the Debtor's conduct as follows:

> We cannot find the exact measure of Jacobs' wealth because he lied to the court about his wealth and attempted to conceal it. He stone-walled plaintiff's efforts to obtain information about it. He refused to appear for depositions after this court had determined that he was liable for punitive damages and before the damage phase of this trial began, by which means plaintiff sought to ascertain Jacobs' net worth. He refused to honor the subpoena duces tecum served upon him requiring him to bring certain information to trial.

*Jacobs II*, 52 D. & C.4th at 384.

33. I can see how one might argue that the Debtor implicitly litigated his intent, honest or fraudulent, by proffering evidence on his net worth. However, the real issue being litigated was the accuracy of the financial disclosures and their effect on the amount of punitive damages to be awarded, not the Debtor's "scienter" in offering evidence that the court ultimately found to be inaccurate and false.

34. While the analogy may not be exact, the Trial Court's finding that the Debtor obstructed the inquiry into his net worth may be akin to the findings made by a federal court exercising its inherent power to sanction an attorney for misconduct. Such sanctions are only imposed for bad faith conduct after some particularized notice and an opportunity to respond to the charge that the conduct was in bad faith. *See Fellheimer, Eichen & Braverman v. Charter Technologies, Inc.*, 57 F.3d 1215 (3d Cir.1995). The relevance of the sanctions "analogy" to the situation before me is that although a federal court may exercise its inherent powers and impose sanctions based on a party's prior submissions to the court or prior conduct before the court, the sanctions are not imposed until after a separate hearing has been held to determine whether the conduct was in bad faith. Here, the Trial Court obviously believed that the Debtor withheld information and presented an inaccurate picture of his financial condition. But there was no litigation regarding the Debtor's scienter. In this court, the Debtor contends that, whatever inferences regarding his scienter the Trial Court may have drawn from his evidentiary submissions, he made his financial disclosures in the state court in good faith based on advice of counsel. *See* Affidavit of Neal M. Jacobs at ¶ 13 ("Debtor's Affidavit"), attached as Exhibit A to Debtor's Brief. While the issue is not entirely free from doubt, I conclude that the better course is to provide the Debtor with the opportunity to be heard on the issue.

To the extent that it is relevant, *see* n. 24, *supra,* I also have doubts that the Trial Court's findings regarding the Debtor's intent to conceal were essential to the judgment. My research has not revealed any authority to support the proposition that a party's conduct and/or honesty during the course of a trial can be a determinative factor in rendering a punitive award. This, too, suggests that any findings regarding the Debtor's intent in submitting the evidence that the Trial Court found to be not credible was not essential to its decision and was dicta. Consequently, I conclude that the Debtor is not estopped from attempting to prove that he lacked an intent to defraud when he concealed asset(s) in the course of the damages phase of the Viener Litigation.[35]

## V. *SUMMARY JUDGMENT WILL BE DENIED ON THE § 727(a)(3) AND § 727(a)(5) CLAIMS*

### A. § 727(a)(3)

11 U.S.C. § 727(a)(3) provides for the denial of the discharge of a debtor who has concealed, destroyed, mutilated, falsified or failed to keep recorded information regarding his or her financial affairs. "The purpose of section 727(a)(3) is to give creditors and the bankruptcy court complete and accurate information concerning the status of the debtors's affairs and to test the completeness of the disclosure requisite to a discharge." *Meridian Bank v. Alten,* 958 F.2d 1226, 1230 (3d Cir.1992) (citing 4 *Collier on Bankruptcy* ¶ 727.03[1] (15th ed.1979)). It also ensures that "creditors are supplied with dependable information on which they can rely in tracing a debtor's financial history." *Id.* at 1230.

To state a prima facie case under section 727(a)(3), a party objecting to the discharge must show that (1) the debtor failed to maintain and preserve adequate records and (2) this failure to maintain makes it impossible to ascertain the debtor's financial condition and material business transactions. *Id.* at 1232. The objecting party must make an initial showing that the debtor's records are inadequate. *Id.* at 1233. Once the objecting party meets the initial burden of showing that the records are insufficient to ascertain the debtor's financial condition, then the burden of coming forward shifts to the debtor to provide an explanation for the failure to keep adequate records. *Id.* at 1232–33; *In re Wasserman,* 332 B.R. 325, 331 (Bankr.N.D.Ill.2005).

The Trustee again urges the court to look at the findings from the state court damages trial to support his § 727(a)(3) claim. The Trustee suggests that the Debtor "is a sophisticated businessman

---

**35.** Because I have concluded that the Trustee is not entitled to summary judgment due to a failure of proof on the issue of the Debtor's intent, I need not discuss the § 727(a)(2)(A) requirements that (a) the Debtor's conduct amounted to a "concealment" of Hillcrest and (b) that the Debtor's conduct with the requisite intent occurred within one year of filing the bankruptcy petition. In the spirit of Rule 56(d)(1), I observe that the Debtor's conduct leading up to and during the damages hearing in September 2000 occurred more than one (1) year prior to the filing of the bankruptcy case in October 2001 (unless his critical conduct occurred after the hearing in the damages phase of the Viener Litigation was reopened for rebuttal in April 2001). Thus, at first blush, it appears that the Debtor's conduct may have been too remote in time from the bankruptcy filing to support a § 727(a)(2)(A) claim and that the Trustee can prevail only if he can establish that the doctrine of "continuous concealment" is applicable. *See Rosen,* 996 F.2d at 1531. In this Circuit, *Rosen* suggests that it may difficult to prove "continuous concealment" at the summary judgment stage of a § 727(a)(A) adversary proceeding. *See id.,* 996 F.2d at 1531–34.

who is/should be familiar with appropriate record keeping practices" and points to what he deems "questionable business transactions" that the Debtor engaged in prior to filing his bankruptcy petition. *See* Trustee's Brief at 8. Specifically, the Trustee claims that he cannot ascertain whether the Debtor has an interest in NV Sportswear or whether the Debtor received any income from this entity in the two years prior to the bankruptcy filing. In light of the Trial Court's findings that the Debtor was paid compensation based upon the NV Sportswear's profits (even as the Debtor denied having an ownership interest in the company), the Trustee suggests that there is a discrepancy between the Debtor's bankruptcy Schedule I and his Statement of Financial Affairs. Trustee's Brief at 9.[36]

The Trustee also directs the court's attention to the state court findings regarding the Debtor's alleged transfers of NKM and Hillcrest and the Debtor's ownership in Kimmex. As explained above, the state court found that the Debtor never transferred his one-half interest in Hillcrest (a finding that I adopt above) and that the transfer of NKM was a "fraudulent conveyance." As to Kimmex, the Trustee points out that the Debtor's supplemental attachment to Schedule B claims the Debtor holds a 49% interest in Kimmex, but that the state court found, *inter alia*, that (1) Kimmex never provided the Debtor with a K–1 showing his share of profits as an owner of Kimmex; (2) Kimmex's books are held in Mexico and the Debtor never saw them; and (3) the Debtor willfully concealed his interest in Kimmex. Trustee's Brief at 10.

The discrepancies the Trustee raises may be troubling, but essentially are a legal *non sequitur* with respect to 11 U.S.C. § 727(a)(3); they have nothing to do with the Debtor's alleged failure to maintain adequate records as contemplated by § 727(a)(3). The Trustee has submitted no evidence suggesting that the Debtor cannot produce records that would permit the Trustee to reconcile the alleged discrepancies and ascertain the Debtor's financial condition. Indeed, nothing in the record even indicates whether the Trustee requested any documentation from the Debtor regarding the alleged discrepancies before initiating the § 727 AP. Simply put, the record is totally bare on the question whether the Debtor has concealed, destroyed, mutilated, falsified or failed to keep recorded information regarding his financial affairs. Therefore, summary judgment will be denied on the Trustee's § 727(a)(3) claim. *See, e.g., In re French,* 499 F.3d 345, 356 n. 9 (4th Cir.2007) (summary judgment denied on § 727(a)(3) claim because, *inter alia*, plaintiff failed to produce evidence regarding timing of requests made for financial information and the debtor's response thereto); *see also In re Tougas,* 354 B.R. 572 (Bankr.D.Mass. 2006). *Compare In re Gangemi,* 291 B.R. 242, 247 (E.D.N.Y.2003) (summary judgment granted to plaintiff on § 727(a)(3) claim where the debtor failed to produce documents requested of him creating an inference that the debtor failed to maintain the documents).

**B. § 727(a)(5)**

■■ 11 U.S.C. § 727(a)(5) provides that a discharge will be granted unless the debtor fails to satisfactorily explain any loss of assets to meet the debtor's liabilities. A bankruptcy judge has "broad power to decline to grant a discharge where

---

**36.** The Debtor lists on Schedule I that NV Sportswear (and Kimmex) are his employers, but his Statement of Financial Affairs does not indicate whether he received income from NV Sportswear between October 10, 1999 and October 10, 2001.

the debtor does not adequately explain a shortage, loss or disappearance of assets." *Wasserman,* 332 B.R. at 333 (citations omitted).

■ Similar to section 727(a)(3), the analysis under § 727(a)(5) uses a burden shifting framework. *In re Sendecky,* 283 B.R. 760, 766 (8th Cir. BAP 2002). The objecting party must first make a showing that the debtor "at one time owned substantial and identifiable assets that are no longer available to his creditors." *Wasserman,* 332 B.R. at 333. Once that burden has been satisfied, it shifts to the debtor to offer a "satisfactory explanation" for the unavailable assets. *Id.*

■ It is within the court's discretion to determine what constitutes a "satisfactory" explanation for the loss of assets. *In re Mezvinsky,* 265 B.R. 681, 689 (Bankr.E.D.Pa.2001). In making this assessment, the court does not concern itself with the propriety of the disposition of the assets, but only whether the explanation is satisfactory. Courts in this circuit have held that the explanation must convince the judge that the explanation is worthy of belief. *Id.* "The explanation must appear reasonable such that the court no longer wonders what happened to the assets." *In re Shepherd,* 2005 WL 4147868, at *3 (Bankr.D.Kan. Oct. 7, 2005) (citation omitted). *Id.* At minimum, a satisfactory explanation must consist of more than vague, indefinite, and uncorroborated assertions. *Sendecky,* 283 B.R. at 766; *Shepherd,* 2005 WL 4147868, at *3.

#### 1. the Kimmex account

■ To support his claim under § 727(a)(5), the Trustee again relies on findings from *Jacobs II.* Most notably, the Trustee points to the Trial Court's finding that between July 2000 and September 2000, the Debtor withdrew $59,000 from an account at Royal Bank [37] and points out that the Debtor has not explained why these funds do not appear as an asset in his bankruptcy schedules. Trustee's Brief at 12. In response, the Debtor has submitted a copy of the transcript of his sworn testimony at the Rule 2004 Exam. That testimony raises a disputed issue of material fact whether the Debtor has explained satisfactorily the disposition of $59,000.

According to the Debtor, by 1998, his financial condition deteriorated and his income level dropped. By 1999, he asserts that he had virtually no income. *See* Debtor's Affidavit at ¶ 18. Presumably to make ends meet, the Debtor drew money from his account at Kimmex, where he was a 49% shareholder.

Although the Debtor does not make the argument directly, I find it plausible that the $59,000 was used for other living expenses given the Debtor's statement about his financial condition leading up to his decision to sell NKM in 2000. This explanation finds further support in bankruptcy Schedule I filed by the Debtor. In Schedule I, the Debtor reported that he earned $2,000 per month in the year prior to the commencement of the bankruptcy case. This income level appears to be below the level necessary to support the lifestyle to which it is likely he and his family were accustomed. In these circumstances, it is natural to infer that the $59,000 was expended in the ordinary course on customary personal living expenses in the one year period prior to the filing of the bankruptcy case. Therefore, albeit with some

---

**37.** The Trial Court found that the Debtor had access to bank accounts titled in the name of businesses he had an interest in and that he could draw money from two Kimmex bank accounts in his name—one at Royal Bank in Pennsylvania and another in Texas. *See* Trustee's Brief at 12; *Jacobs II,* 52 D. & C.4th at 369.

reluctance, I conclude that there is a disputed issue of material fact that precludes the entry of summary judgment on this issue.[38]

### 2. other alleged unexplained losses

The Trustee also argues that there are unexplained losses pertaining to:

(1) the Debtor's alleged transfer of his interest in NKM, a transfer that the Trial Court found to be a fraudulent conveyance;

(2) the sale of a certain piece of real estate owned by NKM for less than the purchase price;

(3) the Debtor's alleged conveyance of his one-half interest in Hillcrest, which the state court found to have not occurred; and

(4) $200,000 worth of equipment the Debtor claimed to have supplied to Kimmex during the state damages trial, which is now absent from his schedules.

■ With respect to the first two (2) assets on the list, the Trustee appears to misapprehend the nature of a § 727(a)(5) claim. The transfer of an asset for less than fair consideration may be grounds for denial of discharge under another subsection of § 727(a). In seeking summary judgment under § 727(a)(2)(A), the Trustee did not refer to these alleged fraudulent transfers. Without prejudging whether, after trial, the transfers support a denial of discharge under § 727(a)(2)(A), I perceive no unexplained loss as contemplated by § 727(a)(5) in connection with these assets.

As for the third asset, Hillcrest, I have already discussed the Debtor's alleged transfer of Hillcrest in my discussion of § 727(a)(2)(A). The issue under § 727(a)(5), however, is the unexplained loss of the asset. I understand the Trustee's argument to be that § 727(a)(5) applies because the state court found the Debtor retained his interest, but did not report it in his schedules. Again, the Trustee's argument does not square with the text or purpose of § 727(a)(5). Hillcrest is not a "lost" asset. There is simply a question whether the Debtor retained his ownership of it.

■ Finally, the Trustee suggests that there is $200,000 worth of equipment the Debtor previously claimed to have supplied to Kimmex now absent from his schedules. In response, the Debtor explained that Kimmex ultimately ceased business operations, closed its doors and that some machinery and equipment were seized by the Mexican government to pay severance to Kimmex employees. *See* Debtor's Brief at 18 (citing to the Rule 2004 Exam at 133–135). This proffered explanation creates a disputed issue of material fact that precludes the entry of summary judgment.

## VI. *CONCLUSION*

For the foregoing reasons, the motion for summary judgment of the Trustee will be denied in its entirety. An Order consistent with this Memorandum Opinion will be entered.

## *ORDER*

**AND NOW,** upon consideration of the Plaintiff's Motion for Summary Judgment ("the Motion") and the Defendant's re-

---

**38.** In short, given the plethora of factual detail in the summary judgment record regarding the Debtor's business and financial dealings, I am unwilling to deny the Debtor's discharge at the summary judgment stage based entirely on the absence of a better explanation of the disposition of the relatively modest amount of money withdrawn from the Kimmex account—at least where the surrounding circumstances suggest that a satisfactory explanation may well exist. That said, the denial of summary judgment on this issue does not preclude the Trustee from pressing the issue at trial and the Debtor is well advised to address the issue in more depth at that time.

sponse thereto, and for the reasons set forth in the accompanying Memorandum Opinion, it is hereby **ORDERED** that:

1. The Motion is **DENIED**.

2. Pursuant to Federal Rule of Civil Procedure 56(d)(1), it is **SPECIFIED** that the following material facts are not genuinely at issue:

> As of April 24, 2001, the Debtor owned an interest in an asset known as the Hillcrest Racquet Club.

It is hereby further **ORDERED** that:

2. On or before **February 18, 2008,** the parties shall file a joint pretrial statement and file a copy with chambers. The joint pretrial statement shall be signed by all counsel. *It is the obligation of the plaintiff's counsel to initiate the procedures for its preparation and to assemble and submit the proposed pretrial statement to the court.* Plaintiff's counsel shall submit a proposed joint pretrial statement to defendant's counsel not less than 7 days prior to the deadline for its submission. Counsel are expected to make a diligent effort to prepare a proposed pretrial statement in which will be noted all of the issues on which the parties are in agreement and all of those issues on which they disagree. The proposed pretrial statement shall govern the conduct of the trial and shall supersede all prior pleadings in the case. Amendments will be allowed only in exceptional circumstances and to prevent manifest injustice.

3. The joint pretrial statement shall be in the following form:

A. *Basis of jurisdiction.* (including a statement whether this matter is core or noncore). If the matter is noncore, the parties shall state whether they consent to the court's entry of a final order pursuant to 28 U.S.C. § 157(c)(2). If the parties disagree, they shall each cite to relevant authority to support their positions.

B. *Statement of uncontested facts.*

C. *Statement of facts which are in dispute.* [No facts should be disputed unless opposing counsel expects to present contrary evidence on the point at trial, or genuinely challenges the fact on credibility grounds.]

D. *Damages or other relief.* A statement of damages claimed or relief sought. A party seeking damages shall list each item claimed under a separate descriptive heading, shall provide a detailed description of each item and state the amount of damages claimed. A party seeking relief other than damages shall list the exact form of relief sought with precise designations of persons, parties, places and things expected to be included in any order providing relief.

E. *Legal issues presented* and the constitutional, statutory, regulatory and decisional authorities relied upon. (Counsel should include a brief statement regarding which party has the burden of proof on each legal issue).

F. *Witnesses* listed along with a brief statement of the evidence the witness will give. Witnesses shall be classified between those who any party expects to present and those whom any party may call if the need arises. If not already provided to all parties, the address and telephone number of each witness shall be disclosed.

G. *A list of all exhibits* to be offered into evidence which shall be serially numbered and physically marked before trial in accordance with the schedule. Documents which a party may offer if the need arises shall be separately identified.

H. *Motion(s) In Limine:* The parties shall identify any Motions *In Limine* that they believe need to be resolved prior to trial. The nature of the issue shall be described in sufficient detail to facilitate a discussion of the issue(s) at the final pretrial/settlement conference and to permit the court to issue an appropriate scheduling order, if necessary, for the filing and resolution of such Motion(s).

I. *A list of each discovery item* and trial deposition to be offered into evidence. (Counsel shall designate by page portion of deposition testimony and by number the interrogatories which shall be offered in evidence at trial).

J. *Estimated trial time.*

5. A mandatory final pretrial/settlement conference shall be held on **February 28, 2008, at 1:00 p.m., in Bankruptcy Courtroom No. 1, U.S. Courthouse, 900 Market Street, 2d Floor, Philadelphia, PA 19107.**

6. If the adversary proceeding is not resolved prior to the conclusion of the final pretrial/settlement conference, the adversary proceeding shall be set down for trial at the Court's first available date.

7. Each party may file, no later than three (3) days prior to the date of trial, a trial memorandum with service on the opposing part(y)(ies) and a courtesy copy delivered to Chambers. **The trial may be continued only in exceptional circumstances on Motion and leave of Court.**

8. All trial exhibits shall be pre-marked and exchanged by counsel at least three (3) business days prior to the date of trial.